No. 57,747

STATE OF KANSAS, *Appellee*, v. JAY D. BREAZEALE, *Appellant*.

(714 P.2d 1356)

Opinion filed February 21, 1986.

*Stephen M. Joseph*, of Joseph, Robison & Anderson, P.A., of Wichita, argued the cause and was on the brief for the appellant. *Jay D. Breazeale* was on the briefs pro se.

*Geary N. Gorup*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Clark V. Owens*, district attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: Jay D. Breazeale (defendant-appellant) appeals from convictions by a Sedgwick County jury of three counts of aggravated burglary (K.S.A. 21-3716), one count of attempted aggravated burglary (K.S.A. 21-3301, 21-3716), three counts of aggravated sodomy (K.S.A. 21-3506[a]), one count of attempted rape (K.S.A. 21-3301 and 21-3502), and two counts of unlawful possession of a firearm (K.S.A. 21-4204). The defendant

was also acquitted on charges of aggravated kidnapping, kidnapping, attempted aggravated robbery, aggravated sodomy and unlawful possession of a firearm. The charges arose from five separate incidents in southeast Wichita between February 3, 1982 and October 14, 1982. These incidents are summarized as follows:

I
## FEBRUARY 3, 1982: THE "MRS. X" INCIDENT

At 8:45 a.m. on February 3, 1982, Mrs. X was home with her eighteen-month old daughter when a man she did not know knocked on her front door. The man was wearing a ski mask and a gray hooded sweat shirt. He claimed to be looking for his lost dog. When she said she had not seen the dog, he persuaded her to open her door so he could give her his phone number which he had written on a piece of paper. As soon as she opened the door, the man pulled a small handgun out of the front pocket of his sweat shirt and forced his way into her house.

The man ordered Mrs. X to put her child in the crib. He then ordered her to take off all of her clothes and to give him all of her money. She took off her jeans, shirt and socks and told the man she only had three dollars, but that he should take it and leave. The man then forced Mrs. X into her bedroom, where he removed her bra and threw her onto her bed. While pointing his gun at her head, the man unzipped his jeans and forced his penis into Mrs. X's mouth. He eventually ejaculated in her mouth and she spit this out on the carpet. As soon as the man left, Mrs. X bolted her doors and then called the police.

Mrs. X attended a lineup on May 6, 1983, in which all five participants wore ski masks, gray hooded sweat shirts and blue jeans. Each man was required to say, "Do as I say and you won't get hurt." Mrs. X positively identified the defendant from his voice, his visible facial features, and his body build. Seminal fluid, removed from Mrs. X's carpet, indicated it came from a nonsecretor—that is, an individual whose body fluids do not identify an ABO blood type; nonsecretors make up 20-24% of the population. The defendant is a nonsecretor.

In connection with this incident, the defendant was convicted of aggravated sodomy, aggravated burglary, and unlawful possession of a firearm, but was acquitted on the charge of attempted aggravated robbery.

## II
## MARCH 26, 1982: THE "MISS Y" INCIDENT

On March 26, 1982, a fifteen-year-old junior high school student, Miss Y, was home alone. At approximately 2:00 p.m., a man walked into the house through the front door which she had neglected to close all the way. He approached Miss Y while pointing a small gun at her. He was wearing a ski mask, a blue sweat shirt, blue jeans and gloves. He forced her into the bedroom and made her undress; he apparently became impatient and removed part of her clothing himself. He then attempted sexual intercourse, but was unable to achieve penetration. He next made Miss Y pose in various positions and took pictures of her with a Polaroid camera which he had kept in the front pocket of his sweat shirt. He then forced her to kneel and perform oral sex on him in front of a full-length mirror while he took more pictures. He ejaculated in her mouth and she spit this onto the floor. He then forced her to lie on the bed where he covered her face with a pillow and performed oral sex upon her. Before he left, he threatened to spread the photographs all around her school if she told anyone what had happened. After the man left, Miss Y ran to her school for help.

Miss Y attended the May 6, 1983, lineup which Mrs. X also attended. Miss Y positively identified the defendant based on his voice, body weight and build, and his mustache, which was visible through the ski mask.

In connection with this incident, the defendant was convicted of aggravated burglary, two counts of aggravated sodomy, attempted rape and unlawful possession of a firearm.

## III
## OCTOBER 4, 1982: THE DRYDALE INCIDENT

On October 4, 1982, at 7:20 a.m., fifteen-year-old Douglas Drydale and his thirteen-year-old sister, Amy, were home alone getting ready for school. Douglas looked out a side door in the house and noticed a man, who was wearing a ski mask and a stocking cap, walking down the street and staring at the Drydale house. A few minutes later, Douglas noticed the man had opened their front screen door and was attempting to open the inside door. Douglas and his sister ran from the side door of the house and hid in some bushes in a neighbor's yard. A few minutes later, Douglas saw the man running away from his house. Douglas

returned to his house. He discovered that nothing was missing, but doors were open which had previously been closed.

A neighbor drove Douglas around the block in an attempt to catch the man, but they did not find him. Douglas then called his mother who called the police.

At the same time that Douglas and Amy Drydale were hiding in the bushes, a friend of theirs—Jeanette Arthurs—was walking down the street toward the Drydale house on her way to school. She observed a man who was wearing a stocking cap running up the street from the general direction of the Drydale residence. He seemed to be concealing his face from her; she saw him get into a brown 1979 or 1980 Camaro or Trans Am and drive away. Because she thought his behavior was unusual, she copied down his license plate number onto a piece of paper which she gave to Douglas Drydale who gave it to the police. It was later learned that the license number which Jeanette copied was registered to the defendant's 1979 brown Camaro. When questioned by police, both Douglas and Jeanette said they thought the man might have been black.

The police went to the defendant's residence at 8:00 a.m. that morning. His car was in the driveway and they noticed the hood was still warm. The defendant answered the door and advised the police that he had been home all morning.

The defendant was convicted of aggravated burglary in connection with this incident.

## IV
## OCTOBER 14, 1982: THE CARRILLO INCIDENT

At approximately 1:00 p.m. on October 14, 1982, a man wearing a gray jogging suit parked his sporty, brown, two-door car in the rear parking lot of a church and walked down an alley. This was observed by Joan Todd, a secretary in the church, when she happened to look out a window. As she thought the man's behavior seemed unusual, she told Pat Anderson, who also worked in the church, what she had seen.

At about this same time, a woman who lived down the block from the church observed a man in a gray jogging suit cut across Charlotte Carrillo's yard toward Mrs. Carrillo's front door. A few minutes later, she observed the man returning in the same direction he had come.

Mrs. Carrillo was home alone with her small daughter and saw

the man as he approached her house. His face was hidden by a mask or Halloween-like makeup. He stared at her window for awhile and then moved towards her door. As she heard the locked door rattling, she called the police. The man fled while she was on the phone.

Following this, Pat Anderson looked out the church window and saw a man in a gray sweat shirt running down the alley toward the back of the church. Believing him to be the same man Joan Todd had told her about, she looked at him carefully. She was later able to pick the defendant's picture from a photographic lineup.

At 1:15 p.m., a Wichita police officer who was on patrol in the vicinity of the Carrillo home responded to the dispatcher's call to go to that residence. When he was within a mile of her home, he observed the defendant in his brown Camaro coming from that direction. The police officer turned and followed the defendant and then pulled him over. The officer observed a gray sweat shirt inside the defendant's car. The defendant told the officer that he had just been driving around. A short time later, Mrs. Carrillo was brought to where the defendant was stopped and was asked if she could identify him. She could not, although she said his build was similar.

The defendant was convicted of attempted aggravated burglary in connection with this incident.

The defendant was also charged with aggravated kidnapping, kidnapping, aggravated sodomy and unlawful possession of a firearm in connection with an incident where two young women were accosted in an otherwise deserted dance studio. The jury acquitted the defendant of each of the charges in connection with this incident.

All of the charges against the defendant from these five incidents were consolidated in one trial. This trial lasted for three weeks. After the verdicts were received, the trial court sentenced the defendant to not less than 119 years and not more than life.

The defendant first contends the trial court erred in refusing to grant a mistrial after admitting testimony, pursuant to K.S.A. 60-455, from two victims of the defendant's previous sexual offenses in Colorado. The defendant argues this evidence was not relevant to the purposes for which it was admitted, and that its prejudicial effect outweighed its probative value.

K.S.A. 60-455, which provides for the exclusion of evidence tending to show the defendant's general disposition to commit crime, reads as follows:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Admissibility of other crimes under 60-455 is to be determined by the trial judge prior to the trial and outside the presence of the jury. See *State v. Wasinger*, 220 Kan. 599, 602-03, 556 P.2d 189 (1976). In ruling on the admissibility of the proffered evidence, the trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine that fact is a disputed, material fact, and (3) balance the probative value of the prior conviction evidence against its tendency to prejudice the jury. *State v. Myrick & Nelms*, 228 Kan. 406, 420, 616 P.2d 1066 (1980); *State v. Bly*, 215 Kan. 168, 523 P.2d 397 (1974).

In the case at bar, the trial court conducted a lengthy pretrial hearing on the prosecution's motion requesting admission of evidence of the defendant's convictions in 1973 for rape and deviant sexual intercourse in order to prove motive, intent and identity. The victims did not testify at the pretrial hearing. Instead, the defense and prosecution submitted the facts of the prior convictions to the court based upon the testimony presented at the preliminary hearing (mainly from the detective who had investigated the previous crimes) and the police reports. Both counsel filed lengthy briefs which discussed the application of the three-prong test for admissibility. The court ruled the Colorado convictions were admissible only to prove intent and identity in the *Drydale* and *Carrillo* incidents, and identity in the other incidents. The defendant is not appealing the procedure used in the pretrial hearing. Rather, the defendant claims his motion for mistrial was improperly denied after the victims from the previous crimes were allowed to testify.

Miss P and Mrs. S testified at trial concerning the sex offenses committed against them by the defendant in Colorado in 1972. The trial court gave a contemporaneous oral instruction prior to the introduction of this testimony as to the purposes for which it

could be considered by the jury. Their testimony is summarized as follows:

## Miss P

On September 30, 1972, at approximately 6:15 p.m., a man knocked on the door at Miss P's home in Lakewood, Colorado. The man was Jay D. Breazeale, the defendant. The defendant asked her several questions. He asked if her husband was home, and she responded that he was not. He then asked if this was the residence of a particular person, and again she said "no." The defendant then asked if he could use her telephone. Although she had no phone, she offered to get him her phone directory. As she turned to get the phone book, the defendant walked in, put a gun to her head and forced her into the kitchen. He then ordered her to undress and forced her to perform oral copulation on him. He then forced her to have sexual intercourse. The defendant's only disguise was a pair of sunglasses. Miss P picked the defendant out of a lineup two months later.

## Mrs. S

On November 10, 1972, at 2:25 p.m., Mrs. S was alone in her home near Denver, Colorado, when a man came to the door and asked if he was at a certain person's residence. Mrs. S informed him he had the wrong address. He asked if there was some way he could check the address. She told him she would get the phone book and look it up for him. She shut the door, leaving the defendant on the porch, and walked to her kitchen to get the phone book. The defendant slipped in unnoticed while she looked for the book. He pointed a gun at her and forced her to go upstairs. She tried to talk her way out of the situation, but the defendant threatened to shoot her. The defendant tore off her clothes and she finally submitted to sexual intercourse. She later identified the defendant as her assailant.

The defendant pled guilty to the charges in both of these crimes.

Following the victims' testimony, the defendant moved the court for a mistrial as the evidence concerning the Colorado rapes was not sufficient to satisfy the requirements of K.S.A. 60-455. The court denied the motion and made the additional observation that all the victims were attractive, young and slender women.

Before turning to an examination of whether the three re-

quirements for admissibility were met, we note that there is no requirement under K.S.A. 60-455 that the witnesses who testify at trial about the prior crimes must first testify in person in the pretrial hearing. *State v. Wood*, 230 Kan. 477, 479, 638 P.2d 908 (1982). It is enough that the prosecutor state for the court, in substance, the evidence as to the other crimes or civil wrongs which he or she intends to introduce at trial.

(1) *Relevancy.* The trial court found the evidence of the defendant's prior crimes was relevant to prove identity in all of the charged crimes (except for unlawful possession of a firearm) and to prove intent in the *Drydale* and *Carrillo* incidents. Where a prior conviction is offered for the purpose of proving identity, the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both offenses. *State v. Williams*, 234 Kan. 233, 670 P.2d 1348 (1983); *State v. Bly*, 215 Kan. at 177. Similarity must be shown in order to establish relevancy. *State v. Henson*, 221 Kan. 635, 644, 562 P.3d 51 (1977). It is not sufficient simply to show that the offenses were violations of the same or similar statutes; there should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses. *State v. Bly*, 215 Kan. at 178. In general see Comment, *Evidence: Admissibility of Similar Offenses as Evidence of Identity in a Criminal Trial*, 14 Washburn L.J. 367 (1975). However, the prior offenses need only be similar, not identical in nature. *State v. Williams*, 234 Kan. at 234.

In this case, we find the prior crimes were sufficiently similar to the present offenses so as to raise a reasonable inference that the defendant committed all of the offenses. The victim in each case was a young, attractive, white woman. Each attack occurred at the victim's residence when she was home alone. The perpetrator gained entry through the front door. In the Colorado cases, and the incident with Mrs. X, he did this by tricking the victim. In the other cases, the front door was unlocked so he simply walked in. In each of the cases where the perpetrator gained entry, he held a small gun to the victim's head and forced her to disrobe. In the incidents involving Miss P, Mrs. X, and Miss Y, he unzipped his pants, then forced the victim to kneel and perform oral copulation upon him. In the incidents involving

Mrs. S and Miss Y, he performed (or attempted to perform) sexual intercourse with the victim. The perpetrator did not strike any of the victims, nor did he fire his gun. He took no money or property from the victims' homes. All of the crimes occurred during the daylight hours rather than at night.

The defendant points to the dissimilarities in these cases, and argues the Colorado crimes bear only a "superficial similarity" to the Kansas incidents. In each of the Kansas cases, the perpetrator of the offenses wore a ski mask and a hooded sweat shirt. In the Colorado cases, the defendant wore no disguise aside from sunglasses. We find this difference to be insignificant in light of the many similarities in the actual crimes involved and also in consideration of the length of time between the incidents (which included prison time served by the defendant). Any other dissimilarities in the Colorado crimes, as compared to the Kansas crimes, are also found to be insignificant.

Admittedly, the facts present a close question on whether there were sufficient similarities between the crimes for purposes of K.S.A. 60-455. But, after carefully reviewing the record, we conclude the trial court did not err in finding the prior crimes were relevant to establish the identity of the perpetrator in the present offenses.

The trial court further found the Colorado convictions were relevant to prove intent in the *Drydale* and *Carrillo* cases (where the perpetrator was unable to gain entry). Since burglary is a specific intent crime, the fact that the defendant had committed previous burglaries with the intent to commit rape (or other sexual offenses) was relevant to prove the defendant had the same intent in the *Drydale* and *Carrillo* incidents. See *State v. Faulkner*, 220 Kan. 153, 158, 551 P.2d 1247 (1976). The trial court did not err by so finding.

(2) *Disputed, Material Fact.* The defendant concedes on appeal that the perpetrator's identity was a substantial issue in each of the charged offenses, and that the perpetrator's intent was a disputed and material issue in the *Drydale* and *Carrillo* cases.

(3) *Probative Value Versus Prejudicial Effect.* Before prior crimes evidence becomes admissible under K.S.A. 60-455, the trial court must find that the probative value of the evidence—for the limited purpose for which it is offered—outweighs its prejudicial effect. *State v. Marquez*, 222 Kan. 441, 445, 565 P.2d 245

(1977); K.S.A. 60-445. If the potential for natural bias and prejudice overbalances the contribution to the rational development of the case, the evidence must be barred. *State v. Bly*, 215 Kan. at 175.

The remoteness in time of a previous conviction (in this case, ten years) affects the weight of the prior crimes evidence rather than its admissibility. *State v. Cross*, 216 Kan. 511, 522, 532 P.2d 1357 (1975). Clearly, the relevancy diminishes as the time interval between crimes lengthens.

In the case at bar, the evidence showed the Colorado crimes were very similar to the Kansas offenses, thus, the evidence was clearly relevant. Moreover, the evidence was not merely cumulative as the identity of the perpetrator was a significant issue in each of the cases. The remoteness in time—ten years—is not significant in this case in light of the fact that the defendant spent the intervening time in prison. Although the prior crimes evidence *was* prejudicial to the defendant (as is all evidence against the accused in criminal actions), the trial court did not err in finding the probative value of the evidence outweighed its prejudicial effect. Accordingly, we hold the prior crimes evidence was properly admitted for the purposes specified.

The defendant next argues the trial court erred in denying his motion to sever the charges of unlawful possession of a firearm (K.S.A. 21-4204), or, in the alternative, to limit the evidence of the prior convictions so that the *nature* of those convictions would be excluded from evidence, thereby avoiding unnecessary prejudice to the defendant. Since the trial court granted the prosecution's motion to admit evidence of the defendant's prior convictions under K.S.A. 60-455, the motion to sever or limit evidence in connection with gun charges was rendered moot and was denied. Because we have affirmed the trial court's admission of the prior convictions evidence under 60-455, this issue is moot.

The defendant next contends the complaint affidavit in the *Drydale* and *Carrillo* cases would have been insufficient to support a finding of probable cause if the affidavit had included certain material information which was deliberately omitted.

Based on the original complaint and supporting affidavit issued on May 5, 1983, a probable cause finding was made and an arrest warrant was issued for the defendant's arrest on charges of

aggravated burglary (*Drydale*) and attempted aggravated burglary (*Carrillo*). The defendant was arrested on May 6, 1983.

Prior to the preliminary hearing, the defendant filed a motion to dismiss the complaint and quash the arrest warrant. He claimed that material information had been omitted from the arrest warrant, and that such omission by the prosecution had been deliberate or in reckless disregard for the truth. The defendant claimed the following information was omitted:

(1) In an initial interview with police on October 4, 1982, Douglas Drydale said he thought the man he saw was black.

(2) Douglas Drydale was interviewed again on October 7, 1982, and again said he thought the man was black.

(3) Jeanette Arthurs was interviewed on October 7, 1982, and she said she thought the man she saw was black.

(4) On October 4, 1982, the defendant had a full beard and mustache. Neither Jeanette Arthurs nor Douglas Drydale reported the man they observed had a beard or mustache.

(5) During most of 1982 and part of 1983, Wichita police officers conducted formal and informal surveillance of the defendant. It was observed by those officers that the defendant slept each night at his girlfriend's home and drove his car to his own home at 549 South Delrose each morning.

(6) On May 4, 1983, Mrs. Joan Todd was shown six photographs of cars, including one showing the brown Chevrolet Camaro which belonged to the defendant. The five other cars in the photographic display were red. Mrs. Todd had previously told police that the car she observed in the church parking lot was brown.

After hearing the defendant's preliminary offer of proof and arguments by counsel as to the procedure to be followed and the law to be applied, the court denied the defendant's motion. The court concluded that even if the omitted information had been included in the original affidavit, it would still be sufficient to show probable cause for the issuance of an arrest warrant. The court thereby denied the defendant's request for an evidentiary hearing on the motion. The defendant now contends the trial court erred in its finding that the omission was not material.

Our scope of review on this issue is limited to determining whether the district court's finding is supported by substantial evidence. If it is, such finding will not be disturbed on appeal.

*State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433 (1982); *State v. Strecker*, 230 Kan. 602, 608, 641 P.2d 379 (1982).

In *State v. Jacques*, 225 Kan. 38, 587 P.2d 861 (1978), this court, relying on *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), stated the general rules upon which defendant Breazeale based his motion to dismiss the complaint and quash the arrest warrant:

"[T]here is a presumption of validity with respect to an affidavit supporting a search warrant and generally a party against whom a search warrant is directed may not dispute the matters alleged in the supporting affidavit or application. [Citation omitted.]

"An exception to the above general rule is recognized if the challenger's attack is supported by allegations and an offer of proof under oath that the affidavit or application for search warrant contains material statements of deliberate falsehood or of reckless disregard for the truth. Under this exception an evidentiary hearing would be required on a motion to suppress evidence obtained in the search. The challenger has a duty to point out specifically the portion of the warrant affidavit that is claimed to be false, and a statement of supporting reasons should accompany the motion to suppress." 225 Kan. at 43-44.

Under this rule, if the defendant can show that without the false information the affidavit is insufficient to support a finding of probable cause, then the defendant is entitled, under the Fourth and Fourteenth Amendments, to a full evidentiary hearing on the motion. *Franks v. Delaware*, 438 U.S. at 171-72.

The *Jacques* opinion applies only to cases where false statements are contained in an affidavit for a *search* warrant. In *State v. Lockett*, 232 Kan. 317, this rule was extended to cases where there has been a deliberate omission of material facts from a search warrant affidavit. We now extend the holding in *Lockett* to cases involving affidavits to support *arrest* warrants. Under *Lockett*, when the defendant attacks the affidavit he must show (1) the omission was deliberate, and (2) the omission was material. An omission is material if the original affidavit together with the previously omitted information would not support a finding of probable cause. In the instant case, the trial court found that the affidavit, modified by the addition of the omitted information, was sufficient to support a finding of probable cause.

In *State v. Abu-Isba*, 235 Kan. 851, 853-54, 685 P.2d 856 (1984), this court discussed the probable cause requirement for an arrest warrant:

"Before a warrant for arrest or search may be issued, there must be a finding of probable cause by a neutral and detached magistrate. The complaint should

supply the magistrate with sufficient factual information to support an independent judgment that probable cause exists. Mere conclusions are not sufficient to support such a finding. *Wilbanks v. State*, 224 Kan. 66, Syl. ¶¶ 1, 3, 579 P.2d 132 (1978). Probable cause is the reasonable ground for belief that a specific crime has been committed and that the defendant has committed or is committing it. Under K.S.A. 1983 Supp. 22-2302(1) probable cause information may be set forth in separate affidavits filed with the complaint. Probable cause does not require specific evidence of each element of the offense as would be needed to support a conviction. Probable cause exists if the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed. *State v. Weigel*, 228 Kan. 194, 197, 612 P.2d 636 (1980), and cases cited therein."

In *Abu-Isba,* the court adopted the "totality of the circumstances" approach of *Illinois v. Gates,* 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983), to ascertain whether—based on the totality of the circumstances set forth in the affidavit—a fair probability exists that a crime has been committed and that the defendant committed it.

We find there was substantial evidence to support the trial court's conclusion. In other words, we agree that the omissions from the affidavit (whether or not deliberate) were not material.

While it is true that Douglas Drydale told the police he believed the burglar was a black male, this information becomes less significant when it is learned that the man was wearing a ski mask and stocking cap and that Douglas did not get a good look at him. Douglas told police that he would not be able to identify the man. The existence of the ski mask also lessens the significance of Douglas' failure to report that the man had a mustache or a beard. Similarly, Jeanette Arthurs only caught a glimpse of the defendant's face (he had removed the mask) and she thought he was a black man. However, Jeanette told the police that the man concealed his face from her view. More significant than Jeanette's brief glimpse of the man's face was her ability to view the model and color of his car and its license plate number. The defendant argues that it is much easier for one person to be mistaken about a license plate number than it is for two people to independently make the same mistake about the race of a person, but common sense does not support this argument—especially in light of the fact that both had only brief glimpses of the man.

The addition of the fact that police knew (due to their surveillance) that the defendant spent nights with his girlfriend is also

relatively insignificant. Although the defendant contends this fact explains the observation by police that the defendant's car was not at his home at the time of the *Drydale* incident, when the police questioned the defendant about his whereabouts that morning, he claimed he had never left his home. The police felt the hood of his car and found it to be warm.

When the totality of the information in the *Drydale* incident is examined, it is clear the omitted facts were immaterial and did not affect the basis for finding probable cause. Likewise, in the *Carrillo* case the omissions were immaterial to the finding of probable cause.

Accordingly, we hold there was substantial evidence to support the trial court's finding that any omissions from the affidavit to support the *Drydale/Carrillo* complaint were immaterial. The trial court did not err in denying the defendant's request for an evidentiary hearing.

The defendant next argues that, if we find the arrest warrant defective, the lineup identifications obtained after his arrest were tainted and, therefore, the later arrest warrant which was based on these identifications must be quashed. Since we find the affidavit supporting the arrest warrant in the *Carrillo/Drydale* cases was not defective, this issue need not be addressed.

The defendant next contends the trial court erred by failing to suppress all testimony concerning the photographic display of cars shown to Joan Todd (in connection with the *Carrillo* incident) as such display was unduly suggestive.

On October 14, 1982—the day of the *Carrillo* incident—at approximately 1:00 p.m., Joan Todd looked out the window of the church where she worked and observed a man parking his car in an unpaved parking lot at the rear of the church. (Mrs. Todd thought this was unusual behavior since a paved parking lot was available.) The car was dark brown and had two doors. Mrs. Todd observed a man get out of the car and walk down an alley. Although she could only see the man's back, she noticed he was wearing a jogging outfit and that his hair was dark and balding in the back. She told another woman who worked in the church—Pat Anderson—about the suspicious car in the unpaved lot and about the man she had seen. Approximately fifteen minutes later, Pat Anderson looked out the window and saw a man who had a receding hairline and who was wearing a gray

sweat shirt running down the alley towards the church. Mrs. Anderson got a good look at this man and later picked out the defendant's picture from a photographic lineup.

Mrs. Todd was unable to describe the make or year of the car when she was questioned by police. She only knew that the car was brown and had two doors. On May 4, 1983, Mrs. Todd was shown six photographs of various two-door cars. She was told to ignore the color of the cars and concentrate on their body styles. The pictures included the defendant's brown Camaro and five red cars. Mrs. Todd chose the brown car as looking most like the car in the parking lot, but she made it clear that she could not positively identify any one car.

Prior to trial, the defendant moved for suppression of any testimony concerning the photographic display of the cars. The defendant claimed the photo display was unduly suggestive. Following a hearing on the motion, the trial court ruled that the prosecution could produce testimony regarding the photographic array, but prohibited the prosecution from producing evidence that the brown car in the photograph was the defendant's car.

When Mrs. Todd testified at trial, she was again shown the six photos. She was unable to identify the car she had seen on October 14, 1982. She could only say that the photo of the brown car was the right color.

The defendant argues that the standard for photographic lineups of people should apply in this case. That is, the totality of the circumstances surrounding the lineup must be analyzed to determine whether an identification is so impermissibly suggestive that it gives rise to a very substantial likelihood of irreparable misidentification. *State v. Galloway*, 235 Kan. 70, 89, 680 P.2d 268 (1984); *State v. Ponds*, 227 Kan. 627, 629, 608 P.2d 946 (1980). Although the procedure employed in this case *may* have been unduly suggestive, Mrs. Todd was never able to positively identify any of the cars. The jury was informed only that the car she saw was brown (the same color as the car in the photo) and that it had two doors. The jury was also informed that Pat Anderson positively identified the defendant as the man Mrs. Todd had seen leave the brown car. Therefore, even if there was error, it did not prejudice the substantial rights of the defendant.

A judgment will not be reversed for nonprejudicial error. *State v. Mitchell*, 234 Kan. 185, 196, 672 P.3d 1 (1983).

The remaining issues on appeal were raised by the defendant pro se in a supplemental brief.

He first argues the trial court erred in consolidating the burglary and attempted burglary charges in the *Drydale* and *Carrillo* cases with the burglary, rape and sodomy charges in the remaining cases.

K.S.A. 22-3203 governs consolidation for trial of separate complaints or informations:

"The court may order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment."

Joinder in the same complaint or information is proper if the crimes charged: (1) are of the same or similar character, (2) are based on the same act or transaction, or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. K.S.A. 22-3202(1).

Consolidation in the instant case rests on the same or similar character of the crimes involved. In *State v. Bagby*, 231 Kan. 176, 178, 642 P.2d 993 (1982), this court quoted from *State v. Ralls*, 213 Kan. 249, 256-57, 515 P.2d 1205 (1973), to further delineate the prerequisites for consolidation under these circumstances:

" 'When all of the offenses are of the same general character, require the same mode of trial, the same kind of evidence and occur in the same jurisdiction the defendant may be tried upon several counts of one information or if separate informations have been filed they may be consolidated for trial at one and the same trial.' "

Within these guidelines, the decision to consolidate rests within the sound discretion of the trial court and its holding will not be disturbed on appeal absent a clear showing of abuse of the exercise of that discretion. *State v. Bagby*, 231 Kan at 178; *State v. Howell*, 223 Kan. 282, 573 P.2d 1003 (1977).

While there are certain recognized dangers which may prejudice a defendant when joinder is allowed, a careful review of the record in this case reveals that any prejudice resulting from the refusal to sever was minimal. Even if separate trials had been granted, evidence of one event could have been used in the trial of the other under K.S.A. 60-455. The trial court, in the instant case, instructed the jury that in order to establish intent in the *Drydale* and *Carrillo* cases, they could consider evidence from

each of the other cases. Further, in order to determine identity in each separate case, they were allowed to consider evidence from all other cases. Also, evidence of prior crimes was allowed in under 60-455 to establish intent and identity. This evidence would have been allowed even if the trials had been separated.

The offenses were handled separately and distinctly by counsel in their argument, by the court in its instructions, and in the presentation of evidence. Accordingly, we find no abuse of discretion by the trial court in not severing the *Drydale* and *Carrillo* cases from the other cases.

The defendant next contends the trial court erred in refusing to suppress Pat Anderson's pretrial identification and subsequent courtroom identification of the defendant from a photographic array. The defendant argues the police procedures in conducting the lineup and the photo array itself rendered the photo identifications impermissibly suggestive and created a substantial likelihood of misidentification.

Prior to trial, following a hearing on the defendant's motion to suppress, the trial court found that under the totality of the circumstances, the photographic array and the procedure employed were not unduly suggestive and refused to suppress. There is nothing in the record before this court by which it can be determined whether the trial court erred in these findings. See *State v. Bright*, 229 Kan. 185, Syl. ¶ 6, 623 P.2d 917 (1981).

At trial, Mrs. Anderson was again shown the same photographic array and again positively identified the defendant as the man she saw behind the church on October 14, 1982. The defendant failed to object to the introduction of the photos at trial or to Mrs. Anderson's identification of the defendant from those photographs at trial. Since the defendant has failed to establish the proper foundation for this issue on appeal, we need not review the merits of the defendant's argument.

The defendant's final point on appeal is whether the court erred in denying his motion to suppress all testimony concerning his "arrest" on October 14, 1982, the day of the *Carrillo* incident.

At approximately 1:15 p.m. on October 14, Officer Cheever was dispatched to the Carrillo residence to investigate an attempted burglary. The suspect was described as a white male, 150-60 pounds, 25-30 years old, wearing a gray hooded sweat shirt. As Officer Cheever approached the area, he observed the

defendant in his brown Camaro coming from the vicinity of the Carrillo residence. The defendant fit the general description of the suspect; moreover, Office Cheever was aware of the defendant's past crimes. Due to his suspicions, Officer Cheever pulled the defendant over. When he looked into the defendant's car, he observed a gray sweat shirt on the seat. He asked the defendant what he had been doing, and the defendant said he had just been driving around. The defendant was detained until Mrs. Carrillo arrived, but she was unable to identify the defendant, so he was permitted to leave.

Following the suppression hearing, the trial court found that the defendant was never placed under arrest and, therefore, the police officer had no duty to read him his *Miranda* rights. We agree with this finding. See *State v. Boone*, 220 Kan. 758, 556 P.2d 864 (1976). Officer Cheever had reasonable suspicion to stop the defendant. *State v. Boone*, 220 Kan. 758, Syl. ¶ 3; K.S.A. 22-2402. Officer Cheever's observation of the gray sweat shirt, which was in plain view in the car, was not an unlawful search under the plain view doctrine. *State v. Boone*, 220 Kan. at 765. The trial court properly denied the defendant's motion to suppress Officer Cheever's testimony as to his observations.

The remainder of the testimony regarding the October 14 stop was not prejudicial to the defendant. He did not make any incriminating statements; instead, he denied all involvement with the crime. Mrs. Carrillo was brought to the scene of the stop, but was unable to identify the defendant. Since the defendant was not prejudiced by this testimony, the court did not err by refusing to suppress the testimony.

The judgment of the lower court is affirmed.

LOCKETT, J., not participating.